JS 44 CAND (Rev. 12/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
TradeHill, Inc.

## DEFENDANTS
Dwolla Corp., Ben Milne and Charise Flynn

**(b)** County of Residence of First Listed Plaintiff: San Francisco
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: San Francisco
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pierre G. Basmaji, Law Office of Pierre G. Basmaji
520 Broadway Suite 350 PMB 156
Santa Monica, CA 90401, T: 310-564-6456

Attorneys *(If Known)*

JSC
E-filing
ADR

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | PERSONAL PROPERTY | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☒ 370 Other Fraud | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 380 Other Personal Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. §1964(c)
Brief description of cause:
Conspiracy to Defraud through Racketeering

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 2,000,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

## IX. DIVISIONAL ASSIGNMENT (Civil L.R. 3-2)
*(Place an "X" in One Box Only)*
☒ SAN FRANCISCO/OAKLAND ☐ SAN JOSE ☐ EUREKA

DATE 03/05/2012
SIGNATURE OF ATTORNEY OF RECORD

Pierre G. Basmaji (SBN 246317)
520 Broadway Suite 350 PMB 156
Santa Monica, CA 90401
Telephone: (310) 564-6456
Facsimile: (424) 744-4164
E-mail: pgbasmaji@gmail.com

*Attorney for Plaintiff,*
*TradeHill, Inc.*

E-filing

FILED
2012 MAR -5 A 11: 02
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NO. DIST. OF CALIF.

JSC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| TRADEHILL, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>DWOLLA, INC., a Delaware Corporation; BEN MILNE, an individual; CHARISE FLYNN, an individual; and DOES 1-5,<br><br>Defendants. | CASE NO. CV 12 1082<br><br>**COMPLAINT FOR DAMAGES RESULTING FROM:**<br>1) **VIOLATION OF 18 U.S.C. §1964(c);**<br>2) **FALSE ADVERTISING;**<br>3) **BREACH OF CONTRACT;**<br>4) **INTENTIONAL MISREPRESENTATION;**<br>5) **NEGLIGENT MISREPRESENTATION;**<br>6) **CONCEALMENT;**<br>7) **RESTITUTION AFTER RESCISSION;**<br>8) **CONVERSION; AND**<br>9) **DEFAMATION.** |

JURY DEMAND

For its complaint against defendants Dwolla, Inc. ("Dwolla"), Ben Milne ("Milne"), Charise Flynn ("Flynn") and Does 1 through 5 (collectively, the "Defendants"), plaintiff TradeHill, Inc. ("TradeHill") alleges on personal knowledge as to itself and its own acts and on information and belief as to the Defendants and their acts, as follows:

## JURISDICTION AND VENUE

1. This Court possesses jurisdiction because it involves a federal question, 18 U.S.C. §1964(c). This Court further possesses subject-matter jurisdiction for this action under 28 U.S.C. §1332(a)(1): the defendants are each citizens of different states from the plaintiff and the amount in controversy exceeds $75,000.

2. This Court possesses personal jurisdiction over TradeHill as its principal place of business was in San Francisco, California.

3. This Court possesses personal jurisdiction over Dwolla under California's "long-arm" statute, California Code of Civil Procedure §410.10. Dwolla marketed itself and its services in and willfully conducted direct business with multiple individuals, including TradeHill, in California multiple times and the causes of action claimed below by TradeHill arose out of Dwolla's activities in the Northern District, thereby providing "minimum contacts". *See Boschetto v. Hansing*, 539 F.3d 1011 (9th Cir. 2008).

4. Defendants Milne and Flynn participated in the organization, operation and leadership of Dwolla and directed the enterprise's operations in the Northern District of California.

5. Venue is proper in the Northern District of California under 28 U.S.C. §1391(a)(2) & (b)(2). TradeHill initiated the relationship with Dwolla while its principal place of business was situated in the Northern District. The fraudulent misrepresentations that substantially form the basis for the causes of action in this Complaint were made in response to the activities of TradeHill operations based in the Northern District of California and were directed towards the Northern District of California.

//
//

## PARTIES

6. TradeHill is, at all relevant times, a corporation incorporated under the laws of the State of Delaware or was a sole-proprietorship owned by Jered Kenna with its principle place of business in San Francisco, California. TradeHill and its associated websites and businesses were one of the world's leading resources for Bitcoin, a virtual currency.

7. Dwolla is, and at all relevant times, a business with its principal place of business in Des Moines, Iowa. On or about January 25, 2012, Dwolla incorporated in Delaware; at all other relevant times, it was incorporated in Iowa. At all relevant times, Dwolla was a money service business engaged in money transmission that provided an online payment system utilizing the Automated Clearing House ("ACH") payment processing system for its customers. Dwolla was an Iowa-licensed money transmitter at all relevant times until October 1, 2011 when its license was canceled. Dwolla, including its leadership, ownership, management, employees, associates and other members or representatives, constitutes an "enterprise", as defined in 18 U.S.C. §1961(4), a corporation which is engaged in, and the activities of which effect, interstate commerce.

8. Dwolla operates in the Northern District of California, and elsewhere in the United States and abroad, constituting an ongoing corporate organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

9. Milne, a resident of Newton, Iowa, is and was at all relevant times the chief executive officer of Dwolla.

10. Flynn, a resident of Des Moines, Iowa, is and was at all relevant times the chief operating officer of Dwolla.

11. The identities of the Defendants named "Does 1 through 5" are not currently known by TradeHill. If and when TradeHill learns enough information on their identities, they shall be added to this action.

## COMMON ALLEGATIONS

12. TradeHill entered into a merchant-customer relationship with Dwolla on or about June 8, 2011. As a merchant providing Bitcoin exchange and other services, TradeHill would direct its customers to Dwolla for purchases of TradeHill services or for involvement in TradeHill's Bitcoin exchange. TradeHill was attracted to Dwolla – as opposed to competitors such as PayPal, Inc. – because of Dwolla's very low transaction fee, $0.25 per transaction, and because Dwolla heavily advertised that it did not "chargeback", that its transactions were "as good as cash".

13. A "chargeback" is a practice in the financial services and money transmitting industries. It is used by financial institutions utilizing the ACH system to protect customers from fraudulent merchants (in the ACH system, a "chargeback" is formally referred to as a "reversal"). Essentially, if a customer complains to his financial institution that he did not receive a product or service as promised from a merchant and files appropriate paperwork (such an affidavit), the transfer may be reversed and the customer's funds will be returned. Dwolla clearly knew about chargebacks and specifically tailored its business strategy around them. By promising and advertising that there will be no chargebacks to its customers, Dwolla was expressly taking all responsibility for any chargeback request from the financial institution and that its customers would incur no loss from said chargeback requests.

14. TradeHill, before entering into a relationship with Dwolla, confirmed multiple times that Dwolla did, in fact, have a "no chargeback" policy with Dwolla's customer service representatives. This policy would continually be confirmed by TradeHill and other parties up until or about July 27, 2011. TradeHill relied upon Dwolla's advertisements and representations before entering into a contractual relationship with Dwolla for money-transmitting services. TradeHill's reliance was reasonable.

15. Between June 1, 2011 and July 27, 2011 (the "Time Period"), TradeHill conducted about 10,000 transactions worth over $2,000,000 in transactions using Dwolla as the

middle-man. Dwolla received about $2,500 in transaction fees from TradeHill during the Time Period.

16. During the Time Period, Dwolla would send two emails concerning each transaction to TradeHill. One email would state that the payment was "pending" and would soon be delivered to TradeHill's account. After the money was transferred to TradeHill's account, a second email would state that the customer's payment was "successfully received" and that TradeHill's account was "credited" with the payment. At this point, according to Dwolla's own advertising materials (transactions "as good as cash") and conversations TradeHill had with Dwolla representatives before and during the Time Period, the "crediting" would NOT be reversed by Dwolla. Dwolla, however, knew or should have known that these representations were false. Based on these misrepresentations, TradeHill believed that it could then provide services to the customer without any risk of the transaction being reversed and losing the money. TradeHill then provided the services to the customer.

17. Unbeknownst to TradeHill and Dwolla, a number of customers were using Dwolla to receive services from TradeHill for free.

18. These customers would purchase TradeHill services and be directed to Dwolla to complete the money transfer. TradeHill, once it received confirmation that the funds were credited to its account from Dwolla, TradeHill would then provide its services. (Internal records of TradeHill and/or publicly available Bitcoin records can show that TradeHill actually provided services or sold Bitcoins to all of its customers.) These customers then filed affidavits with the financial institution and the financial institution demanded a chargeback of these funds from Dwolla. Despite repeated requests made by TradeHill for these affidavits and repeated promises by Dwolla to provide them, Dwolla has not provided a single affidavit supposedly associated with these chargebacks; as such, TradeHill can only allege these affidavits' existence – and that the transfers reversed mentioned in this Complaint were actually based on chargeback requests – based on information and belief. If these affidavits do not in fact exist,

Dwolla simply reversed these transactions for no reason and TradeHill shall amend this Complaint accordingly.

19. At this point, under its own advertised (and confirmed) "no chargeback" policy, Dwolla should have been responsible for absorbing the loss of these chargebacks. Dwolla was contractually barred from forcing its customers to take the loss. However, Dwolla did not follow its own policies. Without any kind of notice, Dwolla reversed "credited" transactions to "pending" transactions in TradeHill's account for multiple transactions during the Time Period. TradeHill did not receive any emails, phone calls, or any other form of communication concerning these reversals.

20. On or about July 10, 2011, employees of TradeHill began to suspect something was wrong with their supposedly "credited" transactions. Even though TradeHill was not receiving notices from Dwolla, the number of "credited" transactions was not compatible with the number of sales TradeHill conducted; the dollar amount of "credited" transactions was diverging sharply lower compared to TradeHill's internal sales figures. To confirm the suspicions, TradeHill created a simple program to compare transactional histories from one day to the next (these histories were provided by Dwolla in a spreadsheet TradeHill could download at any time). Using this program, TradeHill was able to confirm that multiple "credited" transactions were reversed to "pending" daily with no notice provided by Dwolla.

21. From July 14, 2011 through July 25, 2011, TradeHill attempted to resolve this issue with Dwolla. TradeHill contacted Dwolla's customer service multiple times and sent multiple emails directly to Dwolla's corporate officers, including Flynn. Dwolla offered largely silence to TradeHill's concerns; the responses it did provide between July 14 and July 25 were nonsensical or vague. TradeHill, at this point, was not just concerned with the losses it was incurring; TradeHill wanted to help Dwolla stop the scammers and did not believe Dwolla was purposefully trying to take money from TradeHill. TradeHill, once it discovered the scheme, was able to stop sales to some customers who were attempting to scam TradeHill again using the same names or

other identifying information. TradeHill was willing to share this information with Dwolla and come to a compromise regarding the lost funds. TradeHill also offered to provide Dwolla with information confirming that TradeHill did, in fact, provide the services it promised to deliver and that the chargebacks were fraudulently filed; Dwolla did not attempt to accept receipt of this information. Dwolla simply assumed TradeHill was the fraudulent party even though a minimal investigation would have clearly discovered TradeHill was the victim.

22. Dwolla during this period of silence continued to reverse credited transactions from TradeHill's accounts, resulting in even more losses for TradeHill. After a week and a half of silence, stonewalling and increasingly frustrating non-responses from Dwolla, TradeHill went public with its concerns on July 25, 2011. TradeHill representatives explained how these customers were abusing the system and offered, again, to resolve this dispute with Dwolla amicably. Also on July 25, 2011, because of its unanswered concerns and in an attempt to mitigate its losses, TradeHill stopped directing its customers to conduct transactions through Dwolla.

23. In response to TradeHill's public statements, Dwolla almost completely scrubbed its website. Nearly all references to the "no chargeback" policy were removed. In its place: 1) posts were uploaded in the "Frequently Asked Questions" section and other areas that indicated chargebacks would be assessed to its customers; 2) the transaction history spreadsheets provided to TradeHill and other customers were radically altered to include a "Return Credit" section; 3) and the Terms of Service were changed to specifically indicate that customers were responsible for chargebacks. Dwolla also added an unconscionable and unenforceable arbitration provision to the Terms of Service which read, in part, "Any purchase or transaction involving virtual currency or a virtual product is not eligible for a dispute or arbitration." (As of the date of this Complaint, this arbitration provision is still in Dwolla's Terms of Service.) In essence, Dwolla, finding out that its "no chargeback" policy was a very poor long-term business strategy (especially if customers actually expected Dwolla to abide by it),

changed its entire marketing strategy and business model. At the same time, Dwolla was also making it blatantly clear through the unconscionable arbitration provision and other changes to its website that it had no intention of resolving the dispute with TradeHill and believed that it was under no obligation to do so.

24. Once Dwolla included the "Return Credit" section in its transactional history, TradeHill confirmed that reversals were actually being done without notice or a procedure to dispute (before then, the only evidence TradeHill possessed was its own program's results). The "Return Credit" section, however, did not explain why these transactions were being reversed. These reversals would not stop; in August, 2011, Dwolla reversed multiple July 2011 transactions without explanation.

25. The total amount of customer transactions conducted during the Time Period reversed/chargebacked by Dwolla without notice and against their own policies and obligations totaled $94,878.72.

26. On July 25, 2011, TradeHill attempted to withdraw $70,000 from its Dwolla account. Sometime between July 25 and July 30, 2011, Dwolla contacted Veridian Credit Union ("Veridian") to have those transactions blocked or reversed by claiming TradeHill or its owners/representatives were committing fraud. Dwolla did not contact TradeHill before contacting Veridian, did not possess any evidence showing that TradeHill was actually a fraudulent business, and made no attempt to discuss these issues with TradeHill; Dwolla's statement to Veridian was reckless and/or made with malicious intent. As of the date of this Complaint, TradeHill does not know why those transactions were blocked. Dwolla has continually refused to account for that $70,000 or return the money to TradeHill despite multiple requests to do so.

27. In total, Dwolla currently unjustifiably possesses $164,878.72 of TradeHill's funds. All attempts made by TradeHill since July 25, 2011 to prove that it provided the services related to the reversed transactions, to retrieve the funds, or negotiate or mediate an out-of-court settlement have been completely ignored by Dwolla. As a result, TradeHill has operated at a significant loss since July 2011 and most of its employees

went without pay from September 2011. On February 13, 2012, mostly as a result of these cash flow problems, TradeHill was forced to suspend most of its operations. And, as a result of this suspension, TradeHill also lost rights to bitcoin.com, bitcoin.co and bitcoin.co.nz, very valuable Internet domains. In order to receive rights to bitcoin.com, bitcoin.co and bitcoin.co.nz, TradeHill exchanged $1,000,000 in equity with a third party. TradeHill, on information and belief, also believes Dwolla's false statements to Veridian naming TradeHill as a fraudulent business have severely impacted TradeHill's attempts to secure long-term banking options with the country's major banks which impacted its ability to do business before the February 13 suspension. The harm to TradeHill's reputation and business due to Dwolla's actions cannot be calculated but are substantially higher than $164,878.72.

28. In the pre-July 27, 2011 Terms of Service, there is an arbitration provision requiring all disputes between Dwolla and its customers be settled with the assistance of an arbitration firm in Minnesota. Dwolla, however, has waived this arbitration provision by its actions since July 27, 2011 by refusing to consent to any sort of dispute resolution process. Dwolla has made no attempt to speak to TradeHill or have the dispute settled out-of-court, despite multiple attempts made by TradeHill's owners, officers, employees and attorneys. TradeHill does not pray for specific performance of this arbitration provision; instead, it seeks to enforce its rights in this Court under state and federal law.

## FIRST CLAIM FOR RELIEF
### (18 U.S.C. §1964(c))

29. TradeHill reallages, and incorporates by reference, the allegations of paragraphs 1 through 28, inclusive, as if fully set forth herein.
30. The purpose of the Dwolla enterprise include, but are not limited to, the enrichment of its leaders, owners, managers and others through, among other things, committing wire fraud of Dwolla customers and committing bank fraud.

31. Among the means and methods by which defendants Milne, Flynn and Does 1 through 5 and other members and associates of the Dwolla enterprise conduct and participate in the conduct of the affairs of the enterprise are the following: conspiring to commit, committing and attempting to commit multiple acts of wire fraud and bank fraud.

32. Beginning on a date unknown to TradeHill, but certainly by May 1, 2011, and continuing until or about July 27, 2011, in San Francisco County, within the Northern District of California, and elsewhere, defendants Milne, Flynn and Does 1 through 5, being persons employed by and associated with the enterprise described above, namely Dwolla, which engaged in and the activities of which affected interstate and foreign commerce, unlawfully and knowingly combined, conspired, confederated and agreed together and with each other to violated 18 U.S.C. §§1962 & 1964, that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§1961(1) & 1961(5), as set forth below. It was further part of the conspiracy that the above-named defendants agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

33. <u>Pattern of Racketeering Activity</u>. The pattern of racketeering activity, as defined in 18 U.S.C. §§1961(1) & 1961(5), consisted of the following acts:

**Racketeering Acts: Wire Fraud in Violation of 18 U.S.C. §1343**

34. The defendants named below committed or caused the committal of the following acts of wire fraud. Beginning on a date unknown to TradeHill, but certainly by May 1, 2011 defendants Milne, Flynn and Does 1 through 5, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

   a. Devised a scheme or artifice, namely false advertisements on Dwolla's website claiming that Dwolla had a "no chargeback" policy, for the purpose of obtaining the property of TradeHill and others by fraud. This scheme or artifice was transmitted over wire communications using writings, signs, signals, pictures and/or sounds.

10
*Complaint for Damages*

b. Devised a scheme or artifice, namely a pattern of intentional misrepresentations to potential and current customers of Dwolla falsely claiming that Dwolla had a "no chargeback" policy, for the purpose of obtaining the property of TradeHill and others by fraud. This scheme or artifice was transmitted over wire communications using writings, signs, signals, pictures and/or sounds.

c. Devised a scheme or artifice, namely the concealment of applying chargebacks to its customers without providing notice to its customers of those chargebacks (and while continuing to claim it had a "no chargeback" policy), for the purpose of obtaining property of TradeHill and others by fraud. This scheme or artifice was transmitted over wire communications using writings, signs, signals, pictures and/or sounds.

d. Devised a scheme or artifice, namely the blocking TradeHill's attempt to withdraw $70,000 on July 25, 2011 without justification, for the purpose of obtaining property of TradeHill by fraud. This scheme or artifice was transmitted over wire communications using writings, signs, signals, pictures and/or sounds.

35. TradeHill relied on the fraudulent representations committed by defendants Milne, Flynn and Does 1 through 5.

**Racketeering Acts: Bank Fraud in Violation of 18 U.S.C. §1344**

36. The defendants named below committed or caused the committal of the following acts of bank fraud. Beginning on July 25, 2011 and continuing until on or about August 15, 2011 defendants Milne, Flynn and Does 1 through 5, conspired and agreed with each other to knowingly and intentionally commit the following offense:

a. Devised a scheme or artifice, namely by communicating information defendants Milne, Flynn and Does 1 through 5 knew or should have known was false, to obtain moneys under the custody or control of Veridian by means of false or fraudulent representations concerning TradeHill.

37. <u>Overt Acts</u>. In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, defendants Milne, Flynn and Does 1 through 5 committed or caused to be

committed various overt acts, on or about the following dates, including but not limited to, the following:

a. By, latest March 30, 2011, falsely advertising that Dwolla had a "no chargeback" policy on Dwolla's website and authorizing that the falsehood to be communicated to potential and current Dwolla customers.

b. On or about June 8, 2011, authorizing Dwolla's customer service representatives to falsely state to TradeHill that Dwolla had a "no chargeback" policy.

c. Between June 15, 2011 and August 31, 2011, fraudulently reversed the following transactions "credited" during the Time Period with no notice provided to TradeHill (by reference number): 121457, 126546, 136999, 137213, 139722, 142359, 143043, 143303, 143755, 144547, 144554, 145055, 150259, 156387, 156984, 156988, 160181, 160185, 167428, 167577, 168914, 174003, 174021, 183142, 183433, 183455, 183485, 183498, 183997, 184003, 184333, 184558, 185473, 190120, 190128, 190133, 190143, 192943, 193166, 193483, 193546, 194951, 195027, 195351 and 195358.

d. Between on or about July 25, 2011 and August 15, 2011 intentionally misrepresenting or causing to be misrepresented the business activities of TradeHill to Veridian, preventing the transfer of $70,000 in funds belonging to TradeHill to accounts under TradeHill's control.

## SECOND CLAIM FOR RELIEF

### (False Advertising)

38. TradeHill reallages, and incorporates by reference, the allegations of paragraphs 1 through 28 and 37, inclusive, as if fully set forth herein.

39. Dwolla advertised the following claims on its website and in conversations with TradeHill representatives that were false: a) that it had a "no chargeback" policy; and b) all transactions done through Dwolla were "as good as cash". At the time Dwolla publicized these false advertisements, it intended for customers – including TradeHill – to rely upon them and enter into contractual relationships with Dwolla.

40. TradeHill reasonably relied upon Dwolla's advertised policies by confirming the existence of the "no chargeback" policy. TradeHill entered into a relationship with Dwolla on the expectation that policies advertised will be followed by Dwolla.

41. Dwolla's actual policies differed substantially and materially from the "no chargeback" policy falsely advertised. Dwolla, in fact, reversed multiple transactions TradeHill was led to believe were "credited, "complete" and "as good as cash".

42. As a result of this false advertising and its reasonable reliance on it, TradeHill was substantially damaged. TradeHill completed sales worth $94,878.72 but the funds for those sales were reversed by Dwolla. As a result of cash flow problems directly related to Dwolla's actions, TradeHill was also forced to shut down operations on February 13, 2012, leading to substantial damage to its reputation and the loss of the $1,000,000 property, bitcoin.com, bitcoin.co and bitcoin.co.nz.

43. In doing the acts alleged herein, Dwolla acted with malice, fraud or oppression, thereby entitling TradeHill to an award of punitive damages in an amount to be determined at trial. The malice, fraud or oppression of Dwolla was committed by one or more of its officers, directors, managing agents or representatives acting within the course of his or her employment.

## THIRD CAUSE OF ACTION

### (Breach of Contract)

44. TradeHill reallages, and incorporates by reference, the allegations of paragraphs 1 through 28 and 37, inclusive, as if fully set forth herein.

45. On or about June 8, 2011 TradeHill and Dwolla entered into a contract for money transmission services. This contractual relationship was governed by the Terms of Service in effect at the time. That version of the Terms of Service did not include any provision for returns or chargebacks, returns or holds and Dwolla had further represented prior to the contractual relationship that Dwolla would not pass chargebacks to its customers.

46. By reversing "credited" transactions that Dwolla had promised were "as good as cash", Dwolla breached the contract with and its obligations to TradeHill.

47. As a result of this breach of contract, TradeHill was substantially damaged. TradeHill completed sales worth $94,878.72 but the funds for those sales were reversed by Dwolla, in contravention of the contract with TradeHill. As a result of cash flow problems directly related to Dwolla's actions, TradeHill was also forced to shut down operations on February 13, 2012, leading to substantial damage to its reputation and the loss of the $1,000,000 property, bitcoin.com, bitcoin.co and bitcoin.co.nz.

48. Dwolla cannot assert that this dispute must be resolved by arbitration. Dwolla has waived its right to resolve this contractual dispute by arbitration by ignoring all entreaties by TradeHill to settle this dispute out-of-court. TradeHill thereby asserts and protects its rights in this Court.

## FOURTH CAUSE OF ACTION

### (Intentional Misrepresentation)

49. TradeHill reallages, and incorporates by reference, the allegations of paragraphs 1 through 28 and 37, inclusive, as if fully set forth herein.

50. The material representations made by Dwolla concerning its "no chargeback" and "no reversals" policies were false in the following respect: Dwolla did not have a "no chargeback" policy and did, in fact, reverse customer transactions after receiving a chargeback request from a credit card company.

51. At the time Dwolla made these false representations, it knew that these representations were false or made them recklessly without regard to the truth.

52. At the time Dwolla made these false representations, it intended TradeHill to rely upon those representations.

53. At the time Dwolla made these false representations, TradeHill did not know these representations to be false, but believed them to be true. TradeHill reasonably relied on these false representations in entering into the relationship with Dwolla. If

TradeHill had known the truth, it would not have entered into the relationship with Dwolla, paid the transaction fees due, or otherwise satisfied its obligations.

54. Dwolla and its representatives continued to make these false representations during the Time Period to TradeHill and third parties, even while Dwolla was reversing "credited" transactions without explanation or notice.

55. TradeHill was substantially damaged as a direct result of relying on these false representations, including the $94,878.72 unjustifiably taken by Dwolla. As a result of cash flow problems directly related to Dwolla's actions, TradeHill was also forced to shut down operations on February 13, 2012, leading to substantial damage to its reputation and the loss of the $1,000,000 property, bitcoin.com, bitcoin.co and bitcoin.co.nz.

56. In doing the acts alleged herein, Dwolla acted with malice, fraud or oppression, thereby entitling TradeHill to an award of punitive damages in an amount to be determined at trial. The malice, fraud or oppression of Dwolla was committed by one or more of its officers, directors, managing agents or representatives acting within the course of his or her employment.

## **FIFTH CAUSE OF ACTION**

### **(Negligent Misrepresentation)**

57. TradeHill reallages, and incorporates by reference, the allegations of paragraphs 1 through 28, 37, and 49 through 56, inclusive, as if fully set forth herein.

58. At the time Dwolla made the false representations detailed in the Common Allegations and in the Third Cause of Action concerning its "no chargeback" policy, it did not have reasonable grounds for believing the representations to be true.

## **SIXTH CAUSE OF ACTION**

### **(Concealment)**

59. TradeHill reallages, and incorporates by reference, the allegations of paragraphs 1 through 28 and 37, inclusive, as if fully set forth herein.

60. In making the representations concerning its "no chargeback" policy set forth in the Common Allegations, Dwolla concealed important and material facts: that it did have a chargeback policy and that Dwolla will reverse transactions if a transaction was reversed by a financial institution.

61. Dwolla intended to deceive TradeHill by concealing these material facts.

62. TradeHill did not know these concealed material facts at the time it entered into its relationship with Dwolla and at the times it paid the amounts due and otherwise discharged its obligations.

63. If TradeHill had known these concealed facts, it would not have entered into the relationship with Dwolla.

64. Dwolla continued to conceal these material facts during the Time Period, by not providing any notice to TradeHill that "credited" transactions were being reversed and by not providing any explanation for the reversals once TradeHill communicated to Dwolla.

65. As a direct result of Dwolla's concealment of material facts, TradeHill has been substantially damaged, including the $94,878.72 unjustifiably taken by Dwolla. As a result of cash flow problems directly related to Dwolla's actions, TradeHill was also forced to shut down operations on February 13, 2012, leading to substantial damage to its reputation and the loss of the $1,000,000 property, bitcoin.com, bitcoin.co and bitcoin.co.nz.

66. In performing the acts herein alleged, Dwolla acted with malice, fraud or oppression and with the intent to harm TradeHill, thereby entitling TradeHill to an award of punitive damages in an amount to be determined at trial. The malice, fraud or oppression was committed by an officer, director, managing agent or representative of Dwolla, acting within the scope of his or her employment.

//
//
//

## SEVENTH CAUSE OF ACTION

### (Restitution after Rescission)

67. TradeHill reallages, and incorporates by reference, the allegations of paragraphs 1 through 28, 37, and 44 through 48, inclusive, as if fully set forth herein.

68. TradeHill is entitled to rescission of the contractual relationship pursuant to California Civil Code §1689 on the grounds that (a) Dwolla's fraud induced TradeHill to enter into the contractual relationship; and (b) there was a total and material failure of consideration.

69. The consideration for TradeHill's payments and other obligations to Dwolla under their contractual relationship was supposed to include the "no chargeback" policy. As described above, there was a total failure to satisfy this policy on Dwolla's part.

70. TradeHill intends service of the summons and complaint in this action to serve as notice of rescission of the contractual relationship and hereby demands that Dwolla restore full consideration furnished by TradeHill for the services Dwolla provided. TradeHill is also entitled to recover compensation for the damages alleged in this Complaint.

## EIGHTH CAUSE OF ACTION

### (Conversion)

71. TradeHill reallages, and incorporates by reference, the allegations of paragraphs 1 through 28 and 37, inclusive, as if fully set forth herein.

72. TradeHill on July 25, 2011 attempted to withdraw $70,000 in funds from its Dwolla account to is Bank of America account. Dwolla between July 25, 2011 and July 30, 2011 communicated with Veridian, falsely and fraudulently claimed that TradeHill (or its owners) was a fraudulent business and reversed those transfers. As a result, Dwolla converted personal property of TradeHill to its possession without any compensation provided to TradeHill and without TradeHill's consent.

73. Dwolla has made no attempt to account for the $70,000 it wrongfully converted and TradeHill's attempts to recover the funds have been fruitless.

17
*Complaint for Damages*

74. As a result of Dwolla's conversion, TradeHill was substantially damaged. The loss of the $70,000 also contributed to cash flow problems at TradeHill. As a result of cash flow problems directly related to Dwolla's actions, TradeHill was also forced to shut down operations on February 13, 2012, leading to substantial damage to its reputation and the loss of the $1,000,000 property, bitcoin.com, bitcoin.co and bitcoin.co.nz.

75. In performing the acts herein alleged, Dwolla acted with malice, fraud or oppression and with the intent to harm TradeHill, thereby entitling TradeHill to an award of punitive damages in an amount to be determined at trial. The malice, fraud or oppression was committed by an officer, director, managing agent or representative of Dwolla, acting within the scope of his or her employment.

## NINTH CAUSE OF ACTION

### (Defamation)

76. TradeHill reallages, and incorporates by reference, the allegations of paragraphs 1 through 28 and 37, inclusive, as if fully set forth herein.

77. Dwolla communicated to Veridian a defamatory message claiming that TradeHill was a fraudulent business in order to reverse TradeHill's withdrawals. Dwolla knew or should have known that the message was false and took no reasonable actions to prove the truth of the message.

78. This defamatory message was communicated to Veridian, a third party, and is inherently harmful to TradeHill's reputation. On information and belief, TradeHill alleges that Dwolla's defamatory message was further communicated by Veridian to other banks and has hindered its ability to retain financial services at other financial service providers. TradeHill's reputation continues to suffer as a result of Dwolla's defamatory message to Veridian.

79. In addition to the harm to TradeHill's reputation, Dwolla's defamatory message caused $70,000 in withdrawals to be reversed. As a result of cash flow problems directly related to Dwolla's actions, TradeHill was also forced to shut down operations on

February 13, 2012, leading to substantial damage to its reputation and the loss of the $1,000,000 property, bitcoin.com, bitcoin.co and bitcoin.co.nz.

80. In performing the acts herein alleged, Dwolla acted with malice, fraud or oppression and with the intent to harm TradeHill, thereby entitling TradeHill to an award of punitive damages in an amount to be determined at trial. The malice, fraud or oppression was committed by an officer, director, managing agent or representative of Dwolla, acting within the scope of his or her employment.

## PRAYER FOR RELIEF

Wherefore, TradeHill prays for judgment against Dwolla as follows:

- Declaring that the contractual relationship between TradeHill and Dwolla has been rescinded and ordering the return of all consideration previously paid by TradeHill to Dwolla;
- Finding that Dwolla waived its right to arbitration under the Terms of Service in effect during the parties' contractual relationship;
- Finding that Dwolla is an enterprise as defined by 18 U.S.C. §1961(4);
- Awarding compensatory damages, the exact amount to be proven at trial;
- Awarding civil damages, costs and attorney's fees under 18 U.S.C. §1964(c), the exact amount to be determined at trial;
- Awarding punitive damages, the exact amount to be determined at trial;
- For interest on its damages in an amount permitted by law, and its costs of suit; and
- For such further relief as this Court may deem just and proper.

DATED:   March 4, 2012            Respectfully Submitted,

                                  By:    //s//  Pierre G. Basmaji
                                  *Attorney for Plaintiff, TradeHill, Inc.*